## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| HOWARD O. FORD,<br><br>                Appellant,<br><br>vs.<br><br>MEGAN J. BRENNAN, Postmaster General, United States Postal Service,<br><br>                Appellee. | **APPELLANT'S OPENING BRIEF**<br><br>No. 21-4086 |
| On Appeal from the United States District Court for the District of Utah No. 2:15-cv-00539-BSJ, The Honorable Bruce S. Jenkins | |

Respectfully submitted,
Jenifer L. Tomchak (10127)
Nicole A. Skolout
10 W. 100 South, Suite 700
Salt Lake City, UT 84101
801-831-4820
Jen.tomchak@tomchaklaw.com

Oral Argument Requested

1

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES                                                      4

PRIOR OR RELATED APPEALS                                                  7

STATEMENT OF JURISDICTION                                                 7

STATEMENT OF ISSUES                                                       7

STATEMENT OF THE CASE                                                     9

    a.  Prior Accommodations                                               9

    b.  Harassment and Requests for Accommodation from May to          10
        July 2013.

    c.  July 16, 2013 – Request and Removal of Accommodations         13

    d.  Retaliation and Denials after July 16, 2013                   15

COURSE OF PROCEEDINGS AND DISPOSITION BELOW                              19

RULINGS PRESENTED FOR REVIEW                                             23

SUMMARY OF THE ARGUMENT                                                  24

STANDARD OF REVIEW                                                       25

ARGUMENT                                                                 26

    I.    THE COURT WEIGHED DISPUTED ISSUED OF                        31
          MATERIAL FACTS.

    II.   THE COURT ERRED WHEN IT HELD THERE WAS NO               32
          ADVERSE-EMPLOYMENT-ACTION.

        A.  The Court Improperly Held Ford's Termination was Not     35
            An Adverse-Employment Action.

B.  The Court Ignored Most of USPS's Conduct.                    36

C.  The Court Ignored Direct Evidence of Discrimination.          40

III.    THE COURT ERRED IN DETERMINING FORD'S                    42
        TERMINATION WAS NOT MOTIVATED BY
        DISCRIMINATION.

IV.     THE COURT ERRED IN DETERMING FORD WAS NOT               45
        AN OTHERWISE QUALIFIED INDIVIDUAL.

A. The Court Limited its Review to Ford's Condition After USPS    45
   Intentionally Exacerbated his Disability.

B. The Court's Finding that Ford Could Not Work was Contrary      48
   to the Evidence.

IV.   THE COURT ERRED WHEN IT FOUND FORD HAD NOT                 52
      REQUESTED A PLAUSIBLY REASONABLE
      ACCOMMODATION.

A. The Court Applied the Wrong Legal Standard to               52
   the Question of Notice.

B. The Court's Holding that USPS Lacked Notice is             55
   Contrary to Ford's Evidence.

C. The Court Erred by Looking Only at one of Ford's          57
   Requests for Accommodation.

D. Ford Requested Accommodation was Not                       59
   Limitless

CONCLUSION                                                       60

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT                         60

CERTIFICATE OF COMPLINANCE WITH RULE 32(a)                       61

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY                61
REDACTIONS

CERTIFICATE OF SERVICE                                      63

**Attachments:**

    A.    The August 27, 2018 Memorandum Decision and Order Granting Defendants' Motion for Summary Judgment.

    B.    The May 14, 2021 Memorandum Decision Denying Motion to Alter Judgement.

    C.    29 U.S.C. §  791

    D.    29 U.S.C. § 2615

    E.    42 U.S.C. § 12112

    F.    42 U.S.C. § 12203

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Bearid v. Seagate Technology, Inc.*, 145 F.3d 1159 (10th Cir. 1998)...............................39, 44

*Berry v. Stevinson Chevrolet*, 74 F.3d 980 (10th Cir. 1996)...............................................33, 40

*C.L. Frates & Co. v. Westchester Fire Ins. Co.*, 728 F.3d 1187 (10th Cir. 2013).........26, 31

*Dalpiaz v. Carbon County*, 760 F.3d 1126 (10th Cir. 2014) .....................................................27

*Desert Palace, Inc. v. Costs*, 539 U.S. 90 (2003).......................................................................40

*Exby-Stolley*, 979 F.3d 784 (10th Cir. 2020) ..............................................................29, 33, 40

*Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir. 1987)..............................................34, 39

*Howard v. Gray*, 821 F. Supp. 2d 155 (D.C. 2011)............................................................45, 46

*Janczak v. Tulsa Winch, Inc.*, 621 F.App'x 528, (10th Cir. 2015)....................................27, 28

*Kim v. Nash Finch Co.*, 123 F.3d 1046 (8th Cir. 1997) ...........................................................33

*Lathem v. Dept. of Children and Youth Services*, 172 F.3d 786 (11th Cir. 1999) .............46

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)........................................................28

*Mueggenborg v. Nortek Air Solutions, LLC*, No. 20-6147, 2021 WL 4807176 (10th Cir) 43

*Munson v. Shriners Hospital*, No. 2:12-cv-00698, 2014 WL 2880264 (D. Utah,

   6/24/2014) ...................................................................................................................................46

*Proctor v. UPS*, 502 F.3d 1200 (10th Cir. 2007).......................................................................35

*Punt v. Kelly Services*, 862 F.3d 1040 (10th Cir. 2017)......................................... 29, 30, 43, 59

*Roberts v. Roadway Exp.,* 149 F.3d 1098 (10th Cir. 1998) ........................................33-36, 39

*Robertson v. Las Animas Cty.*, 500 F.3d 1185 (10th Cir. 2007)......................................53, 54

*Sanchez v. Denver Public Schools*, 164 F.3d 527 (10th Cir. 1998) .......................................34

*Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204 (10th Cir. 1999) .......................................40-41

*Smith v. Diffee Ford*, 298 F.3d 955 (10th Cir. 2002)...........................................................27, 43

*Sowers v. Kemira, Inc.*, 701 F. Supp. 809 (S.D. Ga. 1988)........................................46

*Talavera ex rel. Gonzalez v. Wiley*, 725 F.3d 1262 (10th Cir. 2013)................................25

*White v. Gen. Motors Corp.*, 908 F.2d 669 (10th Cir. 1990) ....................................26, 31

## Statutes

28 U.S.C §1291 ..........................................................................................6

28 U.S.C. §1331 .........................................................................................6

28 U.S.C. §1343 .........................................................................................6

29 U.S.C. § 791 ........................................................................................27

29 U.S.C. §2615 ........................................................................ 19, 20, 25, 26

42 U.S.C. §§ 12111-12, 12203(a) .................................................................27, 45

42 U.S.C. 12203 ......................................................................................27

## Other Authorities

Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under
the ADA ............................................................................................53

## Rules

Fed. R. Civ. P. 56 ................................................................................ 26, 31

## PRIOR OR RELATED APPEALS

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§1331 and 1343.

This Court has subject matter jurisdiction pursuant to 28 U.S.C §1291. Judgment was entered on the underlying claims on August 27, 2018. [Joint Appendix (JA), Vol. C, p. 263 (hereinafter cited as JA.Vol:Pg).] On September 24, 2018, Ford timely filed a Motion to Alter Judgment, which tolled the time to file an appeal. [JA.D:7.] The court ruled on that Motion on May 14, 2021. [JA.D:202.] Ford timely appealed on July 12, 2021. [JA.D:214.] This appeal is from a final judgment that disposes of all claims and appellate review of the court's disposition of the claims is proper and timely.

## STATEMENT OF ISSUES

1.    Whether the court erred when it weighed evidence and made factual determinations that were not in the light most favorable to Ford's evidence?

2.    Whether the court erred when it dismissed Ford's Family and Medical Leave Act (FMLA) Claims and Disability Discrimination Claims under the Vocational Rehabilitation Act of 1973 (Rehab Act) on the ground there was no adverse-employment action based on (a) its finding that Ford's termination was not

an adverse-employment-action; (b)  its holding that it was not required to consider all of USPS's conduct towards Ford; and (c) its holding that an adverse-employment action was necessary to maintain Ford's Disability Discrimination Claims even though Ford presented direct evidence of discriminatory animus?

3.     Whether the court erred when it overlooked most of USPS's conduct and ignored direct evidence to the contrary to hold that USPS was indisputably not motivated by discriminatory animus?

4.     Whether the court erred in dismissing Ford's Disability Discrimination Claims on the basis that he was not an otherwise qualified individual when it (a) only considered Ford's condition after USPS had intentionally exacerbated his disabilities by removing and refusing accommodations; and (b) found as a matter of law that Ford could not work with accommodation?

5.     Whether the court erred when it dismissed Ford's Failure-to-Accommodate Claim by (a) holding that USPS had to have "documented" notice of a request for a specific accommodation; (b) finding that USPS did not have adequate notice of Ford's request for any accommodation; (c) reviewing only one of several instances when Ford requested an accommodation; and (d) holding Ford's request to load his truck with a u-cart was not plausibly reasonable?

## STATEMENT OF THE CASE

Appellant Howard Ford ("Ford") brought this action against Appellee the United States Postal Service ("USPS"), his employer, when it removed prior accommodations, subjected him to constant bullying and harassment for using his previously granted FMLA leave and disability accommodations, and, eventually, terminated him.

### (a) Prior Accommodations

Ford had worked at USPS twenty years when he suffered a life-changing neck injury after a runaway steel parcel gurney operated by another carrier pinned him inside his truck.  [Sum-J.Opp.(JA.B:9).]  The toll this disability placed on Ford's ability to perform everyday functions was so great that Ford fell into a depression and suffered from anxiety, for which he received intermittent FMLA leave.  [*Id.*(JA.B:10).]  Despite these disabilities, Ford was able to continue sorting and delivering mail with the following accommodations:  (1) an 8-hour workday; (2) intermittent tardiness; (3) use of the u-cart to make two trips to his vehicle rather than the orange parcel gurney to load his truck;[1](5) no lifting over 15 lbs, (6)

---

[1] This accommodation was negotiated through his union.  [Sum-J.Opp.(JA.B:15), Ex.1(JA.B:70-71, Depo.45:17-46:16).]  From January 2011, Ford used the u-cart to load his truck in two trips.  Consistent with his doctors' and physical therapists' instructions, from January 2011, Ford used a u-cart because, "the use of the orange parcel gurney is at a bad angle for [his] neck.  It has smaller wheels than a u-cart, it rattles and vibrates when you push it and it aggravates and increases numbness in my hands and fingers."  [Ford.Aff.Ex.D(JA.A:166.]

9

use of an FFV (lefthand brake) vehicle; (7) no overhead lifting; and (8) intermittent use of FMLA time for his approved conditions.  [Ford.Aff.Ex.D(JA.A:110); Sum-J.Opp.Ex.13(JA.C:23), Ex.24(JA.C:103).]  Ford was approved for three FMLA conditions (two for his neck and psychological disabilities) and also given the foregoing requested accommodations between 2007 to April 2013.  [JA.B:10, Ford.Aff.Ex.D(JA.A:183-84).]

### b. Harassment and Requests for Accommodation from May to July 2013.

Beginning in April 2013, a new direct and second-level supervisor, Heidi Clark and Andrea Gunnarson, respectively, prevented Ford from using FMLA leave and removed or interfered with his other accommodations.  [Sum-J.Opp.(JA.B:11).]  They singled Ford out and engaged in a campaign to punish, humiliate, and otherwise discourage Ford from using his FMLA leave and other accommodations.  When Ford introduced himself to Gunnarson on April 15, 2013, she responded, "I know who you are.  Nobody needs three FMLAs."  [Sum-J.Opp.(JA.B:11), Ex.5(JA.B:242-43).]  She told him, FMLA is "a lot of work just so you can be lazy and get out of working."  She then stated that she was going to "fix that," that she would "fix" Ford's use of FMLA leave.  [Sum-J.Opp.(JA.B:11), Ex.5(JA.B:242).]  When Ford would tell "management" that a request exceeded his work restrictions, he would "get in trouble and things [would] blow up to a power struggle and discipline."  [*Id.*(JA.A:122).]  On April 16, 2013, Clark

verbally assaulted Ford relating to his 8-hour restriction.  [Sum-J.Opp.(JA.B:11), Ex.1(JA.B:70, Depo.44:3-8.]  She "was running and screaming and barking and yelling at [Ford]."  [*Id*., Ex.1(JA.B:70, Depo.44:3-8)]  Clark yelled at Ford in front of other employees, ordered him into her office even after he was off the clock, refused to get a shop steward, and threatened to open an investigation of Ford. [*Id.*, Ex.5(JA.B:243-44).]

Because this treatment exacerbated Ford's psychological disability, his doctor prescribed additional medication and counseling and ordered Ford to take leave until April 30, 2013.  [Sum-J.Opp.(JA.B:11), Ex.6(JA.B:247,249).]  Ford requested advanced sick leave—referencing his FMLA number—but this request was denied by Gunnarson, who forced him to take leave without pay (LWOP).[2] [*Id.*(JA.B-248).]

While he was on FMLA leave, his supervisors continued their efforts to deter Ford from exercising his legal rights.  Clark, emailed HRSSC FMLA Western to get information to use against Ford.  She also threatened to discipline him.  [Sum-J.Opp.(JA.B:11-12), Ex.4(JA.B:235), Ex.6(JA.B:251)("Recert request by supv.").]

On May 1, when Ford returned from his FMLA leave, she threatened to treat

---

[2] Ford was eventually granted 16 of the 80 hours requested by another supervisor. (JA.B:250).

Ford's FMLA leave as AWOL (absent without leave). [Ex.4(JA.B:236).]  Before

he could begin working, Clark berated him in front of other employees and

demanded that he justify his time for the day, a requirement that she did not place

on other employees.  [*Id.*, Ex.7(JA.B:254).]  She demanded he provide her a copy

of his doctor's note, over his HIPPA objections and even though Ford had already

sent a copy to DRAC (District Reasonable Accommodation Committee) and the

Western FMLA tracking unit.  [*Id.*]  The next day, Clark ordered Ford to submit to

an interview about his FMLA leave. [Ex.4(JA.B:237)]. She also issued a letter of

warning ostensibly for failure to deliver an express item (even though the

customer's mail was on vacation hold).  [*Id.*(JA.B:13).] Ford filed a union

grievance, which determined USPS did not have just cause for the letter. [Sum-J,

Ex.I(JA.A:223).]  This behavior increased in frequency and degree when Ford

requested or took FMLA leave, requested additional accommodations, or opposed

USPS's efforts to interfere with Ford's rights.  Over the next few months, Ford was

subjected to such frequent and irrational conduct that he dreaded going to work,

fearing that he would be humiliated, disciplined, or fired.  During this time, among

other conduct, Ford's supervisors complained to their supervisors about having to

accommodate Ford, stood over him in an intimidating manner while he worked,

followed him out to his truck while barking orders at him, called him into their

office multiple times, berated him in front of his colleagues, and loudly called him

a "PIECE OF SHIT" and other insults.  [Sum-J.Opp.(JA.B:14); Ex.7(JA.B:255-261).]  During these encounters, Gunnarson would often say that she would "fix" Ford's efforts to take FMLA leave or use his accommodations.  USPS also issued additional letters of warning—one on his birthday—for conduct for which other employees were not disciplined.  For example, Ford was disciplined for taking a break even though he used less than the 10 minutes allowed because he left the premises.  Other carriers were allowed to do this without discipline.  [Sum-J.Opp.(JA.B:14), Ex.2(JA.B:119).]   Clark disciplined Ford for scheduling issues created by his FMLA condition.  She told him USPS would not allow him to change his schedule to accommodate his  "FMLA condition."  [JA.B:239.]

### c.  July 16, 2013 – Request and Removal of Accommodations

When Ford opposed USPS's efforts to interfere with his rights, USPS became more aggressive in its efforts to get rid of Ford. On July 16, 2013, when Ford estimated it would take him until 10 a.m. to sort his mail (instead of by 9:30 a.m.), Clark exploded.  [Sum-J.Opp.(JA.B:14-15), Ford.Aff.(JA.A:164).]  She threatened him, got in his face, and, when Ford backed away and requested union time or a shop representative, Clark refused.  [*Id*.]  She stood 8 feet behind Ford, watching everything he did and asking him to explain how he was doing his job and why.  [*Id.*]  She then ordered Ford to ignore his workplace restrictions and to load his truck by overloading an orange parcel gurney.  [Sum.J.Opp.(JA.B:15).]

Ford told Clark he could not because he "had an on-the-job work injury with a FMLA Case#"; he was "following instructions from [his] Doctor, Physical Therapist, the Union and previous managers." He requested a shop steward or safety captain. [Sum-J.Opp.(JA.B:14-15), Ford.Aff.(JA.A:125, 164).][3] "Ford requested a reasonable accommodation in the form of being allowed to transport parcels from his case to his vehicle the way he had done so for years without incident" and in a manner that USPS allows other carriers to load their trucks. [*Id.*, Ex.1(JA.B:72, 78, Depo. 53:14-25, 76:14-79:13), Ex.2(JA.B:97-99, Depo.8:20-10:21).] These pleas fell on deaf ears, and Clark ordered Ford to use the orange parcel gurney to carry all of his mail in one load to the truck. [*Id.*] Unsurprisingly, Ford's neck disability was exacerbated when the overloaded orange parcel gurney hit the expansion joint, jolting Ford's neck, causing a loud pop, and pain, numbness, and tingling down his arms and hands. [Sum-J.Opp.(JA.B:16), Ex.3(JA.B:150, 155, 190-196); Ex.8(JA.B:265-278).] When he requested the paperwork to report the incident and seek medical attention, Clark refused. [Ex.8(JA.B:275-276)] When Ford told her he was in pain and that he had FMLA, Clark responded that she did not care. [*Id.*] Clark ordered Ford to the doctor, but

---

[3] Importantly, Ford had previously made a request related to the orange parcel gurney. Following an adjudication of that request through labor negotiations, Ford was allowed to load his vehicle with a u-cart until July 16. [Sum-J.Opp.(J.B:15), Ex.1(JA.B:70, Depo.45:17-46:16).]

clocked Ford out (against USPS's procedures). [*Id.*(JA.B:269).] Clark never filled

out the paperwork so Ford was denied Continuation of Pay.

[Ford.Aff.Ex.3(JA.B:159).]

　　　Ford's doctor (Dr. Cheng) prescribed pain medication and released Ford to

return to work the next day with the express written limitation that he be allowed to

load his truck with the u-cart. [Sum-J.Opp.(JA.B:17-18); Ex.9(JA.B:282);

Ford.Aff.Ex.3(JA.B:197).] But *Clark* told Ford not to return to work because

USPS would not accommodate his work limitations. [*Id.*] She also refused to

provide Ford or his Union representative the paperwork to report the incident and

threatened to run Ford's leave as AWOL. [*Id.*]

### d. Retaliation and Denials after July 16, 2013.

　　　When Ford returned on July 24, 2013, Ford's timecard had been moved to

Clark's desk. [Ford Aff.Ex.3(JA.B:203).] At that time, he asked Clark if she had

received his workplace restrictions. [Sum-J.Opp.(JA.B:19);

Ford.Aff.Ex.3(JA.B:203).] Clark confirmed she had them, but denied Ford's

request for assurances that they would be followed. She responded she did not

consider those to be restrictions, "just suggestions," indicating she would not

follow them. [*Id.*]

　　　From July 22-29, 2013, Ford and his shop steward repeatedly requested

union time to discuss and complete paperwork relating to the events of July 16.

[Ford.Aff.Ex.3(JA.B:203).]  These requests were ignored even though the time for filing such grievances were time sensitive.  [*Id*.]  On July 29, when Ford approached the shop steward, Clark ran at Ford screaming that he could not talk to him.  [*Id.*]  When Ford told her, her treatment was causing him increased stress, Clark stated, "if you are so stressed out, why don't you just leave . . . ?"  She ordered him to leave his station and go to the doctor.  [*Id.*(JA.B:204.] As intended, this interaction caused Ford to suffer a panic attack and he had to receive medical attention.  [*Id.*]  That was the last day Ford worked at USPS.

Ford's doctor noted on July 29, 2013, that Ford's anxiety and stress condition had been "made worse by his working for the post office . . . [Due to] continuous issues with supervisors" and a "concerted effort on the part of the post office to brow-beat, bully, and take advantage of some of their senior employees." [Sum-J.Opp.(JA.B:21); Ex. 13(JA.C:24).]  Dr. Morse then notes that Ford's supervisor "blatantly disregarded" prior accommodations given to Ford, and that his re-injury and her treatment of him and his efforts to report the injury made Ford "very anxious, depressed, and down."  The doctor noted that Ford could not go back to work so long as that "hostile environment" persisted.  [*Id.*]  The assessment and plan states that Ford's severe depression and anxiety are workplace related and the result of completely unnecessary behavior by his supervisors.  [*Id.*]  He recommends that Ford take a brief break from working . . . ."  [*Id.*]

Due to the exacerbation of his disabilities, Ford took FMLA protected leave of absence through September 14, 2013, when his FMLA protection was exhausted. [Sum-J.Opp.(JA.B:22).] Ford would not have run out of FMLA leave if USPS had honored his earlier requests for accommodation and not exacerbated his disabilities. [*Id.*] Dr. Morse noted that Ford's condition is improving and that the primary root of his anxiety is his toxic work environment created by his supervisors harassing him for using FMLA leave. [Ex.13(JA.C:27-28).]

Instead of working with Ford to accommodate his disability, including by offering extended and/or advance sick leave or agreeing to abide by his workplace restrictions, Clark demanded that Ford return to work before his medical release or be fired, issued additional letters of warning, and attempted to run Ford as AWOL instead of LWOP. [Sum-J.Opp.(JA.B:22); Ex.15(JA.C:61); Ex.16(JA.C:71-72).] (Notably, other carriers who had been injured and were absent past their FMLA leave had not been disciplined and were allowed to return to work. [Ex.16(JA.C:68-69).]) These letters were later thrown out as baseless and the AWOL status determined inappropriate through the grievance process,[4] but their intended harm was already done and Ford's condition worsened. [*Id.*] USPS then

---

[4] Ex.16(JA.C:72) (scheduling investigation during "medically established absence . . . denied the grievant his day in court"); Ex.18(JA.C:61) (same); Ex.20(JA.C:72) ("medically supported absences" should not have been annotated as AWOL").

did it again (twice), issuing another letter of warning in February 2014 and—after that discipline was "purged and rescinded" as inappropriate—running Ford's absence as AWOL in August 2014, which was also rescinded because "medically supported absences" should not be annotated as AWOL.  [Sum-J.Opp.(JA.B:22-23); Ex.17(JA.C:74); Ex.18(JA.C:78); Ex.20(JA.C:89).]

After Ford's prior requests were denied, in August 2014, Ford's attorney made a formal request that USPS accommodate both his physical and psychological impairments.  [Sum-J.Opp.(JA.B:24); Ex.22(JA.C:97).]  This did not occur.  On October 7, 2014, USPS issued Ford a Notice of Separation.  [Sum-J(JA.A:85).]  This notice was later supposed to be rescinded after Ford filed a grievance, but Ford's file still shows his status as "terminated." [Sum-J.Opp.(JA.B:24), Ex.23( JA.C:102).]

In addition to the foregoing specific instances of adverse-employment actions and retaliatory practices, Ford identified the following examples of discriminatory conduct:  (1) denial of the ability to leave early even if all tasks are completed (and criticizing Ford for doing so even when he was expressly granted permission to do so); (2) disciplining and criticizing Ford for following established USPS protocol; (3) disciplining and criticizing Ford for conduct that had previously been condoned by other supervisors even though a change to those practices had not been conveyed to Ford; (4) criticizing and preventing Ford from

helping a fellow carrier for 15 minutes in a way that helped them both complete their routes within the 8-hour workday restriction; (5) criticizing and disciplining Ford for following safety protocols; (6) refusing to allow Ford time to speak with union representatives or the safety captain about his concerns; (7) refusing to timely complete and make copies available of necessary paperwork; (8) barking and yelling at Ford in front of others; (9) engaging in repeated, frivolous investigations and disciplinary procedures even after they had been determined as baseless through the grievance procedure; (10) refusing to accept new FMLA cases or paperwork; (11) denying Ford advanced sick leave; and (12) requiring him (and others on 8-hour medical restrictions) to work overtime by calling them in on their days off.  [Ford Aff.Ex.3(JA.B:142-220).]

## COURSE OF PROCEEDINGS AND DISPOSITION BELOW

Ford initially brought this action against USPS for violations of the Family Medical Leave Act ("FMLA").  His first claim is that USPS interfered with Ford's FMLA leave, disciplined him, and terminated him, in part, because of his application for, use of, and need for FMLA leave in violation of 29 U.S.C. § 2615(a)(1) (hereinafter "FMLA Interference"). [JA.A:21.]  His second claim is that after Ford applied for and used FMLA leave, USPS "took various adverse actions against him, including eventually terminating his employment" in violation of U.S.C. § 2615(a)(2) (hereinafter "FMLA Retaliation").  [JA.A:23.]  (FMLA

Interference and FMLA Retaliation collectively, "FMLA Claims"). Ford filed a second complaint upon exhaustion of his administrative remedies for those claims. The only claims from that action at issue here are that USPS violated the Vocational Rehabilitation Act of 1973 (the "Rehab Act"), which extends the protections of the Americans with Disabilities Act ("ADA") to federal employees. Specifically, Ford asserted claims for discrimination on the basis of disability and for retaliation for engaging in protected activity under the Rehab Act. Ford's claims under the Rehab Act for disability discrimination included sub-claims that USPS discriminated against Ford due to his disability in the following manners: by "on a frequent basis, . . . harass[ing] Ford about his need for reasonable accommodation" (hereinafter "Disability Harassment"); by, on more than one occasion, failing to grant him (and in some instances actually removing) accommodations that were put in place to accommodate his disabilities ("Failure-to-Accommodate"); that USPS "continued to harass" Ford for using or attempting to use and opposing violations of the protections afforded him by the Rehab Act ("Discrimination Retaliation"); that USPS had "not treated similarly situated non-disabled employees in as harsh and adverse a manner as it treated [] Ford" ("Disparate Treatment"), and it "manifested continued hostility towards him" ("Hostile Work Environment"). [(JA.A:41-42, 46-48, 51, 55 (identifying "sub-claims of harassment, hostile work environment, . . .disparate and adverse

treatment, . . . [and] failure-to-accommodate"), 59, 61.]  Because the standards for the Disability Harassment, Disparate Treatment, Hostile Work Environment, and Disability Retaliation are similar, those are collectively referred to as "Disability Discrimination Claims".  The Disability Discrimination and Failure-to-Accommodate claims are collectively referred to as the "Rehab Act Claims."  The FMLA and Rehab Act cases were consolidated.

On a motion for summary judgment, the court summarily dismissed Ford's FMLA and Rehab Act Claims.  In that Order (the "First Order"), the court made factual findings over Ford's evidence to the contrary.  It then relied on its factual findings to determine USPS was entitled to judgment as a matter of law.  Specifically, it collapsed its analysis of Ford's FMLA Claims and Disability Discrimination Claims and dismissed all of them, holding that neither USPS's conduct nor its termination of Ford was an adverse-employment-action because the termination had been withdrawn.  [JA.C:257-59.]  Next, it dismissed the Failure-to-Accommodate Claim because, it found, USPS did not have "documented" notice of Ford's need for the requested accommodation.  [JA.C.260-61.]  Finally, it dismissed all of Ford's Rehab Act Claims on the additional basis that USPS was not required to accommodate Ford based on its factual finding that after July 29, 2013, Ford was medically unable to return to work. [JA.C.261-62.]

Ford filed a Motion to Alter Judgment under Rule 59 and 60(b) of the Federal Rules of Civil Procedure, asking the court to amend its ruling to fix its manifest legal errors and correct its misapprehension of the facts and law. Ford argued that the court's factual determinations were inappropriate and that the court applied the incorrect legal standards to dismiss Ford's claim. Specifically, Ford argued (1) USPS's steady barrage of harassment and termination of Ford was an adverse-employment action; (2) USPS's obligation to accommodate Ford did not require "documented" notice of Ford's request for accommodation; (3) Ford's ability to work with accommodation should be viewed from the time he requested the accommodation; and (4) Ford was able to work with accommodation both before and after July 29, 2013. [JA.D:9-10.] The court denied the Motion to Alter, holding in that order (the "Second Order") it was improper because Ford had not argued that he was constructively discharged in opposition to the Motion for Summary Judgment. [JA.D:204-205.] It also made the additional findings that Ford's termination was issued for an indisputably non-discriminatory purpose and that Ford's request to load his truck with the u-cart was "limitless." It relied on those new findings to hold that there was no causal connection between Ford's disability and FMLA usage and his termination and that Ford had not requested a reasonable accommodation as additional bases for dismissing Ford's claims. [JA.D:204, 213, n.26.] This appeal followed.

## RULINGS PRESENTED FOR REVIEW

The following rulings are presented for review:

1.      The holding in both Orders that material facts were undisputed, including that the termination was withdrawn, that USPS accommodated Ford's physical disability, that the termination was for non-discriminatory reasons, that USPS had no documented notice of Ford's disability or request for accommodation, and that Ford could not work with a reasonable accommodation. [JA.C:259-62; JA.D:204-206.]

2.      The holding in both Orders that an adverse-employment action was required for Ford to maintain his Disability Discrimination Claims and FMLA Interference Claim. [JA.C:257; JA.D:206.]

3.      The holding in both Orders that USPS's termination of Ford and other conduct directed at him did not constitute an adverse-employment action. [JA.C.258-59; JA.D:204.]

4.      The holding in the Second Order that the court was not required to review all of the evidence and its cumulative impact on Ford's employment to determine whether there was an adverse-employment action. [JA.D:206.]

5.      The holding in the Second Order that there was no evidence that USPS's conduct towards Ford was causally related to his FMLA leave, disabled status, or other protected activity.  [JA.D:204-205.]

6.    The holding in both Orders that USPS had no obligation to accommodate Ford's disability based on his condition after USPS had intentionally exacerbated his disabilities and its improper findings that USPS had no "documented" notice of Ford's physical disability, the requested accommodation for his physical disability was "limitless," and that no accommodation was available for his psychological disability. [JA.C:261; JA.D:209-13.]

7.    The holding in the Second Order that Amendment of the Judgment was inappropriate.  [JA.D:205-206.]

## SUMMARY OF THE ARGUMENT

Summary judgment was inappropriate.  Ford presented sufficient evidence to show disputed issues of material facts.  The court erred by making improper factual findings over this evidence and then applying those facts to incorrect statements of the law.

First, Ford's FMLA and Rehab Act Claims should not have been summarily dismissed for lack of an adverse-employment action because: (1) the court should have viewed all of the conduct directed at Ford and its cumulative impact on his employment; (2) Ford's termination and the conduct directed at him were an adverse-employment action and altered the terms-conditions-and-privileges of his employment; and (3) Ford's Disability Discrimination and FMLA Interference

Claims were supported by direct evidence of discriminatory animus such that an adverse-employment action was not required for a prima facie showing.

Second, Ford claims should not have been summarily dismissed for lack of cause because Ford presented direct evidence of discriminatory animus and significant circumstantial evidence to create an issue of fact as to whether Ford's FMLA and disabled status played a motivating factor in USPS's conduct.

Third, Ford's Rehab Act Claims should not have been dismissed on the additional basis that Ford was not qualified because: (1) the court should have viewed Ford's condition at the time he made each request (instead of after USPS refused multiple accommodations and intentionally exacerbated his disability); and (2) the court should have considered Ford's evidence that he was able to work both before and after those requests were denied.

Fourth, Ford's Failure-to-Accommodate Claim should not have been summarily dismissed because Ford made multiple requests for accommodation in a manner consistent with regulatory guidance and Ford presented evidence that the requests were plausibly reasonable.  Accordingly, the court's orders should be reversed and remanded for consideration by a jury.

## STANDARD OF REVIEW

This Court "review[s] the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to [the nonmoving party] and

drawing all reasonable inferences in [their] favor." *Talavera ex rel. Gonzalez v. Wiley*, 725 F.3d 1262, 1267 (10th Cir. 2013). Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Indeed, "[a]ll disputed facts must be resolved in favor of the party resisting summary judgment." *White v. Gen. Motors Corp.*, 908 F.2d 669, 670 (10th Cir. 1990).  Even "[w]hen the evidence could lead a rational fact-finder to resolve the dispute in favor of either party, summary judgment is improper." *C.L. Frates & Co. v. Westchester Fire Ins. Co.*, 728 F.3d 1187, 1189 (10th Cir. 2013).

The court's failure to follow this standard—by weighing evidence of disputed material facts and making findings contrary to Ford's evidence—is an error that underlies all of the court's holdings.  As discussed below, in every instance, the court's holding relied upon its inappropriate factual findings.

## **ARGUMENT**[5]

Ford appeals the summary dismissal of his FMLA and Rehab Act Claims. The FMLA prohibits employers from interfering with an employee's usage of FMLA leave and from retaliating against the employee for using or requesting

---

[5] The court denied the Motion to Alter Judgment because it claimed that Ford raised some of the arguments for the first time in that Motion.  Rather than address that issue separately, this brief cites to portions of the Memorandum in Opposition to Summary Judgment in which Ford made those arguments.

FMLA leave or opposing violations of the FMLA. *See* 29 U.S.C. §2615(a). The Rehab Act prohibits federal employers from discriminating against an employee due to his disability (or perceived disability) or retaliating against the employee for his use (or attempted use) of accommodations of his disability or for reporting violations of the foregoing. *See* 42 U.S.C. §§12112(b)(1)-(5), 12203(a).[6] There are several sub-claims under the Rehab Act for certain types of discrimination, including those sub-claims asserted by Ford for Disability Harassment, Disparate and Adverse Treatment, Hostile Work Environment, Disability Retaliation, and Failure-to-Accommodate.

An over-arching error in the court's rulings is that it collapsed its analysis of all of Ford's claims even though the elements and burdens are different for each. Specifically, FMLA Interference and Retaliation Claims are "'separate and distinct theories that require different showings, differ with respect to the burden of proof, and differ with respect to the timing of the adverse action.'" *Janczak v. Tulsa Winch, Inc.*, 621 F.App'x 528, 531 (10th Cir. 2015) (quoting *Dalpiaz v. Carbon County*, 760 F.3d 1126, 1131 (10th Cir. 2014)). FMLA Interference is shown if (a) the employee was entitled to FMLA leave; (b) an adverse action by the employer interfered with that right; and (c) the employer's actions were related to the

---

[6] The Rehab Act is analyzed under the same standards as the ADA. *See* 29 USC §791(f).

exercise (or attempted exercise) of FMLA rights. *Dalpiaz*, 760 F.3d at 1132. For an Interference claim, the employee need not show the action was motivated by a bad intent. *Smith v. Diffee Ford*, 298 F.3d 955, 960 (10th Cir. 2002). Once the employee demonstrates interference, the burden shifts to the employer to show that the adverse action would have occurred regardless of the FMLA leave. *See Janczak*, 621 F.App'x at 531. Summary judgment is only appropriate if the evidence is unequivocal and undisputed that the FMLA leave played no role in the adverse action. *See id.* at 532-33.

FMLA Retaliation follows the burden-shifting analysis adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), whereby the employee must first show (a) the employee engaged in a protected activity (such as taking FMLA leave or opposing efforts to interfere with it); (b) the employer took an action that a reasonable employee would have found materially adverse; and (c) there is a causal relationship between the protected activity and adverse action. *See Janczak*, 621 F.App'x at 534. The burden then shifts to the employer to offer "a legitimate, non-retaliatory reason for the employment action" and, if shown, the burden returns to the employee to present evidence that the FMLA leave played some role in the decision such that a reasonable factfinder could conclude that the proffered reason is pretextual. *Id.*

To establish a prima facie case of disability discrimination under the Rehab Act, Ford must make a threshold showing that (a) he is disabled (as defined by the ADA) and (b) an otherwise qualified individual, (c) who was discriminated against (d) on account of his disability. *See, e.g., Punt v. Kelly Services*, 862 F.3d 1040, 1047-48 (10th Cir. 2017). The evidence needed to demonstrate discriminatory nexus varies by the discriminatory conduct asserted. For Ford's Disability Discrimination Claims, the discriminatory nexus can be proved by direct evidence, such as statements by the employer that discrimination or retaliation motivated the employer's action. *See id.* at 1048. If there is no direct evidence, the employee can also present circumstantial evidence, "which is evaluated under the *McDonnell Douglas* burden-shifting framework set forth above to determine whether a reasonable factfinder could infer that the employer's motivation was discriminatory and that any proffered non-discriminatory business reason was merely pretextual." *See id.*[7] For a Failure-to-Accommodate Claim, the employee

---

[7] At the time the court entered its First Order, an employee had the burden of production to show a nexus between his disability and the discriminatory conduct by either presenting direct evidence of discriminatory intent or, if none, circumstantial evidence that (a) the employee suffered an adverse employment action and (b) the action occurred under circumstances giving rise to an inference of discrimination. But in a subsequently issued case, *Exby-Stolley v. Bd. Of Cty. Comm'rs*, this Court held that it was improper to require an adverse employment action on a failure-to-accommodate disability claim because the "adverse employment action" language does not appear in the ADA. 979 F.3d 784, 810 (10th Cir. 2020) (en banc). Instead, this Court clarified that a more "expansive" array of conduct constitutes discrimination under the "terms-conditions-and-

is not required to demonstrate discriminatory intent because "any failure to provide reasonable accommodations for a disability is necessarily because of disability." *Id.* (internal quotation marks omitted). Instead, to show failure-to-accommodate discrimination, he only must show that he requested a "plausibly reasonable accommodation." *Id.* at 1050.

In the case below, the court did not separately analyze Ford's claims.[8]  It assumed—without looking at the elements of the claims, whether there was direct evidence of discriminatory animus, or whether the burden-shifting framework applied—that Ford's FMLA Claims and Disability Discrimination Claims required a finding of an adverse-employment action.  The court then dismissed all of Ford's claims, holding: (I) Ford's termination was not an adverse-employment action; (II) Ford's termination was for an "indisputably" non-discriminatory reason; (III) Ford was not an otherwise qualified individual; and (IV) Ford had not made a

_____

privileged-of-employment" language actually in the statute.  It is unclear whether *Exby*'s elimination of adverse employment action requirement in the failure-to-accommodate setting extends to other types of disability discrimination sub-claims. It should for the same reason: the ADA does not reference "adverse employment action."  Here, as discussed below, Ford did not need to show an adverse employment action because there was direct evidence of discriminatory animus. But even if the Court believes such a showing was necessary, Ford has presented evidence that satisfies even the more restrictive adverse-employment-action analysis.

[8] There is no dispute that Ford was disabled, entitled to take FMLA leave, and engaged in protected activity.  [JA.C:256-257.]

"documented" request for accommodation. [JA.C:250-251, D:205.] In reaching these holdings, the court ignored the summary-judgment standard by making factual findings contrary Ford's evidence. It then applied these improper findings to an incorrect legal standard. Thus, the rulings were contrary to both the facts and the law.

## I. THE COURT WEIGHED DISPUTED ISSUED OF MATERIAL FACTS.

Summary judgment was inappropriate because the holdings relied upon factual findings that were contrary to Ford's evidence. Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "All disputed facts must be resolved in favor of the party resisting summary judgment." *White*, 908 F.2d at 670. Even "[w]hen the evidence could lead a rational fact-finder to resolve the dispute in favor of either party, summary judgment is improper." *C.L. Frates*, 728 F.3d at 1189.

Here, the court failed to view the facts in the light most favorable to Ford. The court adopted USPS's facts, while ignoring material, responsive facts and evidence, as well as the inferences from the evidence, Ford presented. For example, it found (i) Ford's termination was withdrawn; (ii) Ford's termination was "indisputably" for a non-discriminatory reason; (iii) Ford's termination did not materially impact the terms or conditions of his employment; (iv) Ford was unable

to work with a reasonable accommodation; (v) Ford did not accept the modified

job offer; (vi) USPS adequately accommodated Ford's physical disability (vii)

USPS did not have "documented" notice of the need to accommodate Ford; (viii)

Ford did not make a request for a specific accommodation; (ix) USPS had no

notice of Ford's disability that prevented him from pulling or pushing prior to July

22, 2013; and (x) Ford's request to load his truck with a u-cart was "limitless". For

each, the evidence, when viewed in the light most favorable to Ford, warrants a

contrary finding to those entered and relied upon by the court.  These facts are

discussed more fully below in connection with the rulings that relied upon them.

This incorrect application of the summary judgment standard, alone, warrants

reversal.  Without these inappropriate factual findings, the court's rulings have no

basis.

## II.    THE COURT ERRED WHEN IT HELD THERE WAS NO ADVERSE-EMPLOYMENT-ACTION.

The court erred when it held as a matter of law that Ford's termination—and

the steady barrage of other conduct meant to discourage him from using FMLA or

other accommodations and to retaliate against him for doing so—did not constitute

an adverse-employment action.  It dismissed Ford's FMLA and Disability

Discrimination Claims on the grounds that Ford had not suffered an adverse-

employment-action.  [JA.C:2259.]  This holding is contrary to the evidence

presented by Ford and applicable law.

As noted above, the court's first error was that it improperly merged its analysis of Ford's FMLA and Rehab Act Claims.  Whereas the FMLA Claims require a showing of some adverse-employment action, the Rehab Act prohibits any action that impacts the "terms, conditions, and privileges of employment."  *See Exby-Stolley*, 979 F.3d at 818 (declining to equate the terms-conditions-and-privileges-of-employment language of the Rehab Act with an adverse-employment-action).  As this Court has recently recognized, the adverse-employment action and terms-conditions-and-privileges-of-employment language are not interchangeable.  Requiring an adverse-employment action—"effectively adding language to the statutory test"—for disability discrimination claims is in error.  *Id.* at 791, 817-19.  An "adverse-employment action" refers to significant changes in the employee's terms of employment, whereas changes to the "terms-conditions-and-privileges-of-employment" intentionally "covers a wide[r] range of conduct within the employment context".  *Id.* at 817.  But both concepts have been construed liberally to encompass any actions that have "'an adverse impact on future employment opportunities'" or that "'undermine [plaintiff's] position even if he was not discharged, demoted, or suspended.'"  *Roberts v. Roadway Exp.,* 149 F.3d 1098, 1104 (10th Cir. 1998) (quoting *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997); *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996)).  Here, the conduct demonstrated by Ford satisfies either test so this brief

focuses on his satisfaction of the more restrictive adverse-employment-action analysis.

Whether the alleged conduct constitutes an adverse-employment-action is a fact intensive inquiry that requires a case-by-case analysis. *Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir. 1998). "Actions such as … terminations are by their nature adverse, even if subsequently withdrawn." *Roberts*, 149 F.3d at 1104. Similarly, warnings that can be used to support future terminations or demotions also constitute adverse-employment actions. *Id.* Where, as here, there are numerous incidents presented to show discriminatory or retaliatory conduct, the pattern of harassment or toxic work environment itself can be an adverse-employment-action. *See Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412 (10th Cir. 1987). A "steady barrage" of discrimination is legally different from a "few isolated incidents." *See id.* (quotations simplified).

In *Roberts v. Roadway*, this Court upheld the finding of an adverse-employment-action under facts similar to those presented here. The employer issued written warnings and, eventually, a termination notice, all of which were eventually withdrawn through the labor grievance process. 149 F.3d at 1104. (Although, here, the termination was never actually withdrawn.) [Ex.23(JA.C:102) (showing employment status as "terminated").] The employer argued that such conduct could not be adverse because it was withdrawn. This Court rejected that

34

argument, holding that the repeated warnings the plaintiff received, even if withdrawn, were "alone . . . enough to constitute adverse action." *Id.* This Court further found "[a]ctions such as . . . terminations are by their nature adverse, even if subsequently withdrawn." *Roberts*, 149 F.3d at 1104; *see also Proctor v. UPS*, 502 F.3d 1200, 1208 (10th Cir. 2007) ("[A] reasonable employee would certainly find . . . termination … a material adverse action.").

Instead of considering all of the conduct Ford alleged against USPS, the court reviewed only three examples of USPS's actions—two letters of warning, the termination, and USPS's refusal to accommodate Ford on July 16, 2013. [JA.C:259.] It then held that each of those instances, separately, did not constitute an adverse-employment-action as a matter of law. [JA.C:259.] This conclusion was legally and factually erroneous for three reasons:  (A) Ford's termination was an adverse-employment action; (B) the court should have viewed all of the conduct alleged by Ford and its cumulative impact on his employment; and (C) an adverse-employment action was not required for summary judgment because there was direct evidence of discriminatory animus.

### A. The Court Improperly Held Ford's Termination was Not An Adverse-Employment Action.

First, the holding that Ford's termination was not an adverse-employment action was erroneous.  Termination is "by its nature" adverse.  *See Roberts*, 149 F.3d at 1104. The court tried to distinguish Ford's termination from other cases by

holding "mere issuance of a notice of separation . . . is not materially adverse when it was ultimately rescinded." [JA.C:259.] Key to the court's decision was its finding that Ford's termination "was ultimately rescinded." [JA.C:259.] This finding was contrary to Ford's evidence that his file still shows his status as "terminated," [Ex.23(JA.C:102)], and, therefore, inappropriate on a motion for summary judgment. *See supra* §I.

Furthermore, it is well-established in the Tenth Circuit that a termination is an adverse-employment action even if it is later withdrawn. *See Roberts*, 149 F.3d at 1104. In *Roberts*, the employee was fired, but the termination was eventually reversed and the employee was "reinstated after intervention by his union." *Id.* at 1102–03. Like the employee in *Roberts*, Ford was terminated and had to grieve such termination to have it rescinded. But worse than the employee in *Roberts*, Ford was never reinstated to his position and his employment file still shows his status as "terminated". [Ex. 23(JA.C:102).] Consistent with this Court's precedent, Ford's termination was an adverse-employment action regardless of whether it was ultimately rescinded.

### B. The Court Ignored Most of USPS's Conduct.

Second, the court refused to consider the totality of USPS's conduct and its cumulative impact on Ford's job. Ford presented evidence and argued that beginning in April 2013, USPS systematically discriminated against him on the

basis of his disability and "engaged in a deliberate, calculated **campaign to harass**

Ford for using FMLA leave and for needing and requesting reasonable

accommodations." [Sum-J.Opp.(JA.B:8)(emphasis added).]  Ford presented

evidence of months of discrimination and retaliation that went far beyond a few

isolated incidents.[9]  At "each successive link in the chain of events, USPS took

adverse action against Ford," with his termination as the "last link in an entire

chain of events." [Sum-J.Opp.(JA.B:44)]. A reasonable juror could find that an

---

[9] *See supra,* pp.10-19. Also, Ford's evidence included that USPS
management needlessly disciplined him, (JA.B:10); one manager "verbal[ly]
assault[ed]" Ford, saying, "Nobody needs three FMLAs," (JA.B:11); she denied
his request for an accommodation of advance sick leave in April 2013, (*id.*); she
threatened him with discipline and was angry he had used FMLA leave, (JA.B:11-
12); they demanded he provide them with a doctor's note instead of providing it to
the FMLA tracking unit, (JA.B:12); they repeatedly disciplined and harassed him
unnecessarily and for conduct that others did not receive discipline and they
continued to issue these harassing warnings even after being told through the union
grievance process that these warnings were inappropriate, (JA.B:13-14, *supra* n.4);
they removed accommodations that had previously been allowed and which were
provided to others, (JA.B:15-16); they refused to provide Ford with paperwork for
reporting his injuries, (JA.B:17); they refused to implement workplace restrictions
ordered by Ford's doctor in July 2013, (JA.B:17); they refused to allow Ford to
return to work with restrictions in July 2013, (JA.B:17-18); they refused to give
him union time to file grievances through the union (JA.B:20-21); they refused to
provide him advanced sick leave in September 2013 and instead issued letters of
discipline, (JA.B:22); they tried to run Ford as AWOL and continued to discipline
him in October 2103, February 2014, and August 2014, (JA.B:22-23); and they
eventually terminated him, (JA.B:23).  Ford also presented evidence that USPS's
conduct affected him "so adversely that he lost his physical health, he lost his
psychological stability and he lost his job, livelihood and career," and "caused
direct physical injury to Mr. Ford's neck and psychological damage to Mr. Ford's
mental health." (JA.B:8).

employer threatening to "fix" you so that you do not use FMLA leave or other

accommodations and saying they view your use of FMLA leave and

accommodations as laziness; giving you written and oral warnings nearly every

week (and continuing to do so even after union grievances determine these

warnings to be inappropriate); calling you a "piece of shit" and other derogatory

terms in front of your colleagues; standing over you while you complete your

work; ordering you to perform your job without previously granted

accommodations to worsen your disabilities; refusing to allow you to return to

work or to provide you with forms to report your injury; refusing to accept your

doctors' workplace restrictions; and the litany of other conduct meant to demean,

harass, or injure Ford presented in opposition to the Motion for Summary

Judgment satisfies the adverse-employment-action (or terms-conditions-and-

privileges-of- employment) test.  This constant conduct interfered with his ability

to do his job and caused him to live in fear of being fired, punished, and/or injured

every time he came to work.  This conduct was more severe than the conduct this

Court upheld as an adverse-employment action in *Roberts*.

 The court, however, reviewed only three examples of USPS's actions and

considered the impact of each of them separately instead of cumulatively.

[JA.C:258.] It then held that each of those instances, separately, did not constitute

an adverse-employment action as a matter of law.  [JA.C:259.]  The only

explanation given for ignoring this evidence is in the court's Second Order (denying alteration).  There the court claimed it was appropriate for it to focus on only three instances and to view each instance in isolation because Ford had never asserted a claim for constructive discharge. [JA.D:206.] This statement is perplexing. Ford has never asserted a claim for constructive discharge because he was *actually discharged*.  It also reflects a misunderstanding of the law.  It is not necessary to use a magic combination of words to trigger the court's obligation to review all of USPS's conduct towards Ford.  Instead, where, as here, an employee alleges numerous facts showing a "steady barrage" of discriminatory and retaliatory conduct, such conduct should be viewed as a whole with its cumulative impact on the employment. *See Beard v. Seagate Technology, Inc.*, 145 F.3d 1159, 1174 (10th Cir. 1998) ("we are required to consider the totality of . . . circumstantial evidence"); *Hicks*, 833 F.3d at 1413.

Moreover, the conduct asserted against USPS here is similar in every material respect to the conduct this Court upheld as an adverse-employment action in *Roberts*. It would be illogical to find an adverse action under those facts, but to hold that worse conduct here is not an adverse simply because Ford was fired instead of resigning.  Indeed, in *Roberts*, the court stated that the repeated warnings the plaintiff received that were withdrawn prior to his termination were "alone . . . enough to constitute adverse action." 149 F.3d at 1104.  In doing so it cited

39

favorably to cases holding that "[t]hese are the kind of serious employment consequences that adversely affected or undermined [plaintiff's] position, even if he was not discharged, demoted, or suspended" and that any employer action that has "'an adverse impact on future employment opportunities' are legitimately regarded as 'adverse employment action[s].'" *Id.* (alteration in original) (quoting *Berry*, 74 F.3d at 986. Accordingly, Ford presented sufficient evidence from which a reasonable juror could find that he satisfied the adverse-employment action (or terms-conditions-and-privileges-of-employment) test. At a minimum, such conduct was sufficient to show disputed material facts as to that issue.

### C. The Court Ignored Direct Evidence of Discrimination.

In addition, the court's dismissal of Ford's Disability Discrimination Claims for lack of an adverse-employment action was erroneous because there was direct evidence of discrimination. As explained above, disability discrimination can be proved by either direct or indirect evidence. Direct evidence is evidence that, if believed, proves discriminatory animus without resort to inference or presumption. *See Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999) *overruled other grounds Desert Palace, Inc. v. Costs*, 539 U.S. 90 (2003). Only if there is no direct evidence of discrimination does the court need to employ the burden-shifting analysis of whether an adverse-employment action (or changes in the terms,

conditions, and privileges of employment)[10] occurred under circumstances that give rise to an inference of discriminatory animus. *Id.* at 1208.  The court, however, skipped over the analysis of whether there was direct evidence and assumed that an adverse-employment action was required to establish Ford's Disability Discrimination Claims.  [JA.C:257.]  This was legal error.

Ford presented sworn statements showing that Ford's supervisor admitted she intended to discriminate against Ford and punish him for engaging in protected activity.  Specifically, Gunnarson admitted during a grievance interview that she was going to put a stop to Ford's use of FMLA and other accommodations that had been made for his disabilities. [Ford.Aff.(JA.B:212).] Gunnarson "made it very clear [to the NALC shop steward] that she had a clear agenda before she came to Cottonwood and that she had a list of carriers she was going to target" to stop their use of FMLA accommodations, including Ford. [*Id.*] When Ford introduced himself to Gunnarson on April 15, 2013, he notified her of his workplace restrictions. Gunnarson responded, that she was aware of his medical conditions and that she disapproved of his accommodations. [Sum-J.Opp.(JA.B:11) (citing

---

[10] The adverse employment action requirement is likely replaced altogether now by the terms-conditions-and-privileges-of-employment test given this Court's analysis in *Exby*. *See supra* Note 7.  But even under the old burden-shifting framework, an adverse-employment action was unnecessary to prove discrimination if there was direct evidence of discrimination.  *Shorter*, 188 F.3d at 1208.

Ex.5(JA.B:242)); Ford.Aff.Ex.D(JA.A:122).] She questioned why Ford needed FMLA leave, told him she did not care what medical conditions he had, and stated that she intended to "fix" Ford's use of FMLA and other accommodations of his disabilities. [Ex.5(JA.B:242).]

This evidence, if believed—and which must be believed on a motion for summary judgment—shows that USPS's treatment of Ford was unquestionably motivated by discriminatory animus. This direct evidence satisfied Ford's prima facie burden without resort to the burden-shifting, adverse-employment action analysis. Therefore, this ruling should be reversed and remanded.

## III. THE COURT ERRED IN DETERMINING FORD'S TERMINATION WAS NOT MOTIVATED BY DISCRIMINATION.

In its Second Order, the court adopted an alternate basis to dismiss Ford's FMLA and Disability Discrimination Claims. It found "the undisputed reason [for Ford's termination] was nondiscriminatory," and the claims, therefore, lacked causation. [JA.D:204.] This holding was erroneous, first, because the court looked only at Ford's termination and ignored other instances of USPS's discriminatory conduct. This was inappropriate. The court should have reviewed the other conduct directed at Ford to determine whether that conduct was motivated by discrimination. *See supra* §II(B). Even if the termination was automatic, USPS's interference with Ford's FMLA and other accommodations, retaliation for their use, and other discriminatory acts that led up to the termination were not.

42

Second, the court disregarded Ford's direct evidence of discriminatory animus. Such direct evidence removes the FMLA Interference and Disability Discrimination Claims from the burden-shifting framework in which the court looks at the proffered reason for the discriminatory conduct. [*See supra* §II(C).] Similarly, neither the Failure-to-Accommodate nor the FMLA Interference Claim require any showing of intent; only that the FMLA leave or accommodation were interfered with or denied. *Smith*, 298 F.3d at 960; *Punt*, 862 F.3d at 1048.

Furthermore, even if the burden-shifting analysis was necessary, the court was required to next consider the totality of Ford's evidence to determine whether there was sufficient evidence to raise a genuine doubt about USPS's motivation. *See Mueggenborg v. Nortek Air Solutions, LLC*, No. 20-6147, 2021 WL 4807176, *3 (10th Cir. 10.15/21) (citing *Bearid*, 145 at 1175). Ford presented evidence that the termination was the inevitable result—the final link in the chain—of USPS's discriminatory conduct, that pursuant to the labor union grievance process the termination had been determined to be inappropriate (but his status remained as terminated), that his requested for extension of his FMLA or advanced sick leave to avoid termination was denied, that other employees under similar circumstances had been granted the request to extend their FMLA status, and that but for USPS's conduct, Ford would not have exhausted his FMLA. [Sum-J.Opp.(JA.B:22-24, 44-46), Ex.23(JA.C:102); *supra* n.4.] He presented evidence to demonstrate that it

was this ongoing discriminatory animus that resulted in Ford being bullied, then injured when prior accommodations were removed, then told not to return to work even after obtaining medical release, then refused accommodations that would have either allowed him to return to work or to avoid termination, and, eventually, his termination. [*See id.*; *supra* n.9.] Ford's evidence supports an inference that USPS knew that if it continued to bully Ford and deny his accommodations, he would be medically unable to return to work,[11] and that if it continued to discipline him and deny accommodations—running him as AWOL and writing him up when he was on leave—it would eventually be able to "automatically" terminate him. "[S]uch facts justify an inference that the reasons for the Agency's harsh treatment of him are pretextual." [Sum-J.Opp.(JA.B:42).] It would be contrary to the law to excuse USPS from such conduct just because its final action was the inevitable result of its long history of discriminatory conduct. Accordingly, Ford met the burden of production to establish a disputed issue of fact as to whether USPS's

─────────────

[11] Ford presented evidence that when he told Clark that her refusal to honor the medical restrictions recommended by his doctor was stressing him out, Clark responded, "If you're so stressed out, why don't you just leave . . . ?" She then ordered him to go see a doctor. [Ford.Aff.Ex.4(JA.B:204).] She also continued to issue warnings while Ford was on medical leave even after such conduct was deemed inappropriate. *See supra* n.4. The reasonable inference from this evidence is that Clark knew that her conduct was exacerbating Ford's mental disability (because he told her so), and that she continued her conduct anyway, knowing and hoping, that Ford would be unable to work so that she could eventually terminate him.

termination (and the conduct leading to it) was pretextual.

In sum, Ford presented sufficient evidence of USPS's discriminatory animus and pretext to overcome summary judgment. Accordingly, the dismissal of his FMLA and Disability Discrimination Claims for lack of a discriminatory purpose were in error and should be reversed.

## IV.    THE COURT ERRED IN DETERMING FORD WAS NOT AN OTHERWISE QUALIFIED INDIVIDUAL.

Next, the court erred when it dismissed Ford's Rehab Act claims on the additional basis that "by July 29, 2013, Ford was medically restricted from working at all," and, therefore, USPS had "no legal obligation" to accommodate his psychological disability. [JA.C:261; JA.D:209.]  This holding was erroneous because (1) the court misapplied the law when it viewed Ford's condition only *after* USPS's denial/removal of accommodations exacerbated Ford's disabilities and (2) its factual findings were contrary to Ford's evidence that he could work with accommodation.

### A.    The Court Limited its Review to Ford's Condition After USPS Intentionally Exacerbated his Disability.

To establish a disability discrimination claim under the Rehab Act, the employee must show he can "perform the essential functions" of his position with a reasonable accommodation.  42 U.S.C. §12111(8).  This otherwise-qualified-individual inquiry must focus on the employee's condition at the time the request

for accommodation is made and denied. *See Howard v. Gray*, 821 F.Supp.2d 155, 160, 166 (D.C. 2011). This is especially true where the employer's intentional conduct is the cause of or exacerbates the disability. Indeed, federal law permits an employee to receive back pay even for periods when the employee was unable to work "where the [employer]'s discriminatory conduct caused the disability." *Munson v. Shriners Hospital*, No. 2:12-cv-00698, 2014 WL 2880264, *3 (D. Utah, 6/24/2014)(citing *Lathem v. Dept. of Children and Youth Services*, 172 F.3d 786, 794 (11th Cir. 1999)); *see Sowers v. Kemira, Inc.*, 701 F. Supp. 809, 826 (S.D. Ga. 1988)(holding back pay during period of unavailability "justified when the disability would not have occurred but for the employer's discrimination").] In *Howard v. Gray*, the employer made the same argument as USPS: that its termination of the employee was non-discriminatory because the plaintiff was medically unable to return to work and the employer was unwilling to continue leave without pay. 821 F.Supp.2d at 165-66. The court rejected this argument because the plaintiff "was physically able to perform his duties with accommodation when the reasonable accommodation was requested" and "the only reason he did not return to work was that the limitations associated with his disability were not accommodated." *Id.* Put simply, federal law does not permit an employer to ignore an employee's request for a reasonable accommodation, exacerbate the disability or cause further injury to the employee, and then use that

employee's deteriorated status to prove the employee is unable to work and excuse it from its obligation to accommodate. It would be contrary to the Rehab Act's purpose to excuse an employer's failure to accommodate by looking at the employee's condition after the accommodation has been denied, resulting in further deterioration of the employee's abilities. USPS is estopped from benefiting from a condition that it caused.

Here, the court overlooked Ford's evidence of his ability to work—both before and after July 29, 2013—and held "if one is not able to be at work, one cannot be a qualified individual." [JA.D:209.] The court should not have limited its inquiry to looking at Ford's condition after July 29, 2013, or ignored that USPS's conduct caused Ford to be unable to work (without accommodation). Specifically, had the court applied the correct legal standard, viewing Ford's condition at the time he requested the accommodations, Ford was indisputably capable of working with accommodation. He had worked for years with the accommodation before his supervisors decided to remove it. USPS's discrimination against Ford for many months led to his condition on July 29, 2013, and later. *See supra* pp.9-10. "Had Ford not had the neck injury suffered on July 16, 2013, he would probably not have run out of FMLA leave." [Sum-J.Opp(JA.B:22).] "The continuing discipline [resulting from Ford taking FMLA and then LWOP to deal with the exacerbation of his neck injury] further aggravated Mr. Ford's anxiety and depression." [*Id.*]

47

"The ongoing discipline[--the letters of warning and efforts to run Ford as AWOL--]further aggravated Mr. Ford's anxiety and depression."  [Sum-J.Opp(JA.B:23).]

"USPS'[s] failure to accommodate Ford's neck impairment had aggravated his neck impairment.  USPS's continuing efforts to discipline Ford had aggravated his psychological impairments of anxiety and depression . . . . to such a degree that he could return to work only if USPS reasonably accommodated both his physical and psychological impairments, which is what he requested." [Sum-J.Opp(JA.B:23-24.]  It is contrary to the law (and unjust) to look at Ford's deteriorated condition after undergoing such mistreatment to conclude he cannot be accommodated and excuse USPS from the consequences of its misconduct.  This holding should be reversed for a jury to review Ford's condition each time he requested accommodation.

## B.  The Court's Finding that Ford Could Not Work was Contrary to the Evidence.

Second, the court's conclusion that Ford could not work—even after July 29, 2013—relied on factual findings that were contrary to the evidence and reasonable inferences therefrom.  [JA.C:260.]  Ford's evidence showed he could have worked—indeed he did work—at the time he requested accommodations. Ford requested and was denied a reasonable accommodation at least six times prior to July 29, 2013:

48

(1)     On April 15, 2013, Ford told Gunnarson about his workplace restrictions and FMLA leave to accommodate his disabilities. She responded, "Nobody needs three FMLAs." [Sum-J.Opp.(JA.B:11), Ex.5(JA.B:241); Ford.Aff.(JA.A:122).] She then stated that she would "fix" Ford and not allow him to use FMLA leave. [*Id.*]

(2)     On April 16, 2013, Ford's psychological disability worsened after USPS berated him about his 8-hour workplace restriction. Ford asked to use his FMLA leave and requested advanced sick leave, referencing his FMLA case no. [Sum-J.Opp.(JA.B:11), Ex.5(JA.B:242); Ex.6(JA:B:248).] This request was denied and Ford had to take leave without pay (LWOP). [*Id.*] When Ford returned, his supervisors threatened to treat his leave as AWOL, further aggravating his psychological disability. [Sum-J.Opp.Ex. 4(JA.B:236).]

(3)     On July 2, 2013, Clark notified Ford in writing that she was aware of his medical documentation and his approved FMLA condition, but that USPS would not give Ford any ability to change his schedule to accommodate his disabilities. [Ford.Aff.Ex.D(JA.A:187).]

(4)     On July 16, 2013, Clark ordered Ford to use an overloaded orange parcel gurney over Ford's repeated and profuse objections and statements that doing so would be in violation of the workplace restrictions put in place to protect his neck and back disability from further injury. [Sum-J.Opp.(JA.B:15-16); Ford.Aff.Ex.D(JA.A:116, 128); Ford.Depo.Ex.1(JA.B:72 (p.53), B:78-79(p. 76-79).] She demanded he comply, and he was injured. Ford's doctor released him to return to work the next day with restrictions, but *USPS* told Ford not to return to work because it would not accommodate him. [Sum-J.Opp.(JA.B:17-18); Ex.9(JA.B:282).]

(5)     On July 22, 2013, around the time Ford returned to work, he provided USPS with a note from Dr. Woods, indicating that Ford's inability to work was the result of USPS "not accommodating [Ford's] work limitations." [Sum-J.Opp.(JA.B:19-20); Ex.11(JA.C:9).] This led the Health and Resource Management Specialist to direct Ford's supervisors to accommodate his workplace restrictions. Instead, they argued with the Specialist. [Ex.11(JA.C:17).]

(6)     On July 24, 2013, Ford asked his supervisor if she had received instructions about his workplace limitations and whether those instructions had been approved. [Sum-J.Opp.(JA.B:19-20); Ford.Aff.(JA.A:177).] She

responded that she viewed the instructions as "just suggestions," indicating that she still did not intend to comply with them.  [*Id.*]

All of the foregoing denials of accommodations occurred prior to July 29, 2013.  In each instance, Ford continued to work or returned to work after FMLA leave. Viewing Ford's condition from any one of the several times in which his requests for accommodation were refused, Ford was clearly capable of working with an accommodation because he did work (even without the requested accommodation).[12]

At each progressive step, and certainly after USPS's denials exacerbated his disabilities, Ford's psychological condition worsened.[13] Ford feared that returning

--------

[12] Notably, Ford continued to request accommodations after July 2013, which were also refused, further exacerbating his injury. In September 2013, Ford requested advanced sick leave to accommodate his psychological disability and work through the anxiety and depression triggered by USPS's treatment of him and refusal to honor his workplace restrictions. [Sum-J.Opp.(JA.B:22).] Clark instead demanded that he return to work or be fired, issued a letter of warning, and ran Ford as AWOL instead of LWOP. [*Id.*] USPS issued a second letter of warning and ran Ford's absence as AWOL in February 2014.  [*Id.*] The reasonable inference from this evidence is that USPS denied these accommodations and went out of its way to continue to harass Ford, knowing that doing so would exacerbate his disability and render him unable to heal and return to work.

[13] In Ford's file, Ford's doctor noted on July 29, 2013, that Ford's anxiety and stress condition had been "made worse by his working for the post office . . . [Due to] continuous issues with supervisors" and a "concerted effort on the part of the post office to brow-beat, bully, and take advantage of some of their senior employees." [Sum-J.Opp.(JA.B:21); Ex.13(JA.C:24).] He then notes that Ford's supervisor "blatantly disregarded" prior accommodations given to Ford, and that his re-injury and her treatment of him and his efforts to report the injury made Ford "very anxious, depressed, and down."  He stated Ford could not go back to work so

to work when his supervisors refused to honor his workplace restrictions would

permanently deteriorate his physical condition.  This constant fear of injury or

bullying exacerbated his psychological injury.  Even after Ford's condition

worsened as a result of USPS's conduct, Ford's doctors indicated Ford would be

able to return to work after USPS accommodated his psychological disability by

agreeing to cease its bullying and harassment of Ford and assuring him that they

would adhere to his workplace restrictions.  [Sum-J.Opp.(JA.B:21), Ex. 13(JA:C:4-

58, 34), Ex.L(JA.A:230).]  USPS recognized this in its modified job offer, which

Ford accepted subject to his doctor's approval. [Sum-J.Opp.(JA.B:26);

Ex.24(JA.C:104-106); Ex.25(JA.C:132)("Medical evidence indicates that you are

capable of returning to work . . .").] After reviewing the offer with his physicians,

Ford requested additional information about whether USPS would adhere to the

workplace restrictions. [*Id.;* Ex.25(JA.C:136).]  USPS ignored this request, stating

only, "no additional terms will be addressed."  [*Id.;* Ex.25(JA.C:138).]

 In other words, there is ample evidence to show that even after July 2013, if

USPS had provided the requested accommodation—assurances that it would

follow the workplace restrictions ordered by his doctor and cease its harassment of

—————————————————

long as that "hostile environment" persisted. [*Id.*]  The assessment and plan states
that Ford's severe depression and anxiety are workplace related and the result of
*completely unnecessary* behavior by his supervisors. [*Id.* (emphasis added).] He
recommends that Ford take a brief break from working to calm down . . . ." [*Id.*]

Ford—Ford could have returned to work. If the court had properly viewed Ford's evidence in the light most favorable to him and/or applied the correct legal standard, there was sufficient evidence from which a reasonable factfinder could conclude Ford could work. Thus, the court's determination that Ford was not an otherwise qualified individual should be reversed and remanded for consideration by a jury.

### V. THE COURT ERRED WHEN IT FOUND FORD HAD NOT REQUESTED A PLAUSIBLY REASONABLE ACCOMMODATION.

Finally, the court's dismissal of Ford's Failure-to-Accommodate Claim on the ground that USPS did not have "documented" notice of the need for such accommodation was contrary to the law and evidence because: (1) "documented" notice is not required before the duty to accommodate arises; (2) the court disregarded evidence showing that USPS also had prior notice of Ford's disabilities; (3) it failed to review and disregarded evidence of Ford's repeated requests for accommodation prior to, on, and after July 16, 2013; and (4) it ignored evidence showing that the requested accommodations were plausibly reasonable.

### A. The Court Applied the Wrong Legal Standard to the Question of Notice.

First, the court applied the wrong legal standard to the question of notice. In dismissing Ford's Failure-to-Accommodate Claim, the court found that USPS was not required to accommodate Ford on July 16, 2013, because "there is no evidence

that [USPS] had adequate notice of Ford's claimed need for an accommodation"
and the need for the requested accommodation—the use of a U-cart to load Ford's
truck—had not been "documented in [Ford's] file." [Order(JA.C:260).] There is
no requirement that an employer have a documented notice of a need or request for
a specific accommodation before its duty to provide an accommodation arises.
Instead, "a public entity is on notice that an individual needs an accommodation
when it knows that an individual requires one, either because that need is obvious
or because the individual requests an accommodation." *Robertson v. Las Animas
Cty.*, 500 F.3d 1185, 1197-98 (10th Cir. 2007). In other words, the request is
notice. Furthermore, the ADA Enforcement Manual states, "**the employer cannot
ignore the initial request**" for accommodation even if the employer does not have
written notice of the need for an accommodation. *See* Enforcement Guidance:
Reasonable Accommodation and Undue Hardship Under the ADA ("ADA
Manual"), *available at* https://www.eeoc.gov/policy/docs/accommodation.html
[JA.D:139,¶3]. Indeed, it is unlawful for an employer to require additional
documentation of the need for a requested accommodation where, as here, the
employer is aware of the disability, the need for accommodation is obvious, or the
employee has already provided the employer with sufficient information to
substantiate the need for the request. [*Id.* (JA.D:139(¶¶3-6);141(¶8).]

 Here, Ford presented evidence that USPS had actually accommodated Ford

in the manner he was requesting for years prior to its sudden removal of that accommodation without warning. [*See supra* pp.9-10; Sum-J.Opp.(JA.B:16); Ex.1(JA.B:72, 78-79, Depo. 53:14-25, 76:14-79:13), Ex.2(JA.B:97-99, Depo.8:20-10:21).] Moreover, it is undisputed that in the moments leading up to his injury from pushing an overloaded parcel gurney, Ford pleaded with his supervisor to accommodate him—"Ford initially refused to complete the task as ordered because he claimed he was following doctor's orders"—and that his request was summarily denied. [Sum-J.Opp.(JA.B:15-16).] USPS supervisor Clark demanded that Ford load his truck by overloading an orange parcel gurney. [*Id.*] Ford told Clark that he was restricted from doing so, that he was "following instructions from [his] Doctor, Physical Therapist, the Union and previous managers;" and that he "had an on the job work injury with a FMLA Case#." [Sum-J.Opp.(JA.B:15-16); Ford.Aff.Ex.D(JA.A:116, 128).] Ford pleaded with Clark to allow him to load the truck the way he had been doing for years and in a manner that USPS allows other carriers to load their trucks. [*Id.*; Ford.Depo.Ex.1(JA.B:72 (p.53), B:78-79(p. 76-79)); Ford.Depo.Ex.2(JA.B:98-99).] Clark ignored these pleas and ordered Ford to use the orange parcel gurney to carry all of his mail in one load to the truck. [Sum-J.Opp.(JA.B:15-16).] There is no evidence that Clark ever requested any documentation about Ford's workplace restrictions before she would accommodate his request. She simply denied it.

Under the law of this Circuit, Ford's request for a specific accommodation was, alone, sufficient notice to trigger USPS's obligation to provide it. *See Robertson*, 500 F.3d at 1197-98 ("[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one . . . because … the individual requests an accommodation.")  Furthermore, USPS cannot credibly argue that it did not already have notice of Ford's disabilities and restrictions at the time of the incident. It had provided that very accommodation for years. *See supra* n.1.

USPS failed to accommodate—indeed, removed accommodations previously granted to—Ford, at the latest, when Ford asked that USPS comply with his doctor's orders and allow him to load his truck using the u-cart.  By requiring that Ford have a "documented" request for accommodation to be entitled to accommodation, the court did not follow the law.

### B. The Court's Holding that USPS Lacked Notice is Contrary to Ford's Evidence.

Next, even under the inaccurate standard applied by the court, USPS had sufficient notice of Ford's need for accommodation. The court's conclusion that "there is no evidence that [USPS] had adequate notice of Ford's claimed need for accommodation" on July 16, 2013 [Order(JA.C:260-261)], was contrary to the evidence.  Perhaps the strongest contrary evidence was that USPS had provided precisely the accommodation Ford was requesting—allowing him to load his truck

with a u-cart—for years before suddenly removing that accommodation.  *See supra*

n.1.  Also, Gunnarson admitted during a grievance interview that she had "made a

point of" consulting with Ford's prior supervisor about Ford's conditions prior to

becoming his supervisor and that she had told him she did not care what the

conditions were, "Ford was not getting away with his crap [(the FMLA leave and

schedule accommodations)] on her watch." [Ford Aff.Ex.D(JA.A:186).] When

Ford introduced himself to Gunnarson, he notified her of his workplace

restrictions.  Gunnarson responded, that she was aware of his conditions and that

she would not allow him to use his accommodations. She stated that she would

"fix" Ford.  [Ex.5(JA.B:242).] DRAC—the committee responsible for assessing

the need for and providing reasonable accommodations—had records related to

Ford's FMLA leave.  Ford routinely sent his doctor's notes to DRAC. [*See, e.g.,*

FMLA Report.Ex.6(JA.B:251).] Clark clearly knew how to request information

about requested accommodations; she requested information about Ford and his

accommodations on April 23, 2013 by emailing HRSSC FMLA Western.

[Ex.4(JA.B:234).]  Clark notified Ford in writing that she was aware of his medical

documentation and that he had an approved FMLA condition. [Ford

Aff.Ex.D(JA.A:187).][14]

---

[14] Similarly, the court's conclusion that USPS did accommodate Ford after July
16, 2013, is contrary to the evidence.  [Order(JA.C:260).]  Specifically, Ford
provided competent evidence that USPS did not offer to accommodate Ford's

Accordingly, even if a documented need and advance notice were required to trigger an employer's obligation to accommodate, Ford presented sufficient evidence to create a disputed issues of fact as to whether USPS had such notice.

### C. The Court Erred by Looking Only at one of Ford's Requests for Accommodation.

Third, the finding that USPS did not have adequate notice of Ford's need or request for accommodation is also in error because it focuses only on the July 16, 2013 Request, ignoring all the previous and subsequent requests for accommodations that were also denied. [JA.C:260.]  As detailed above, Ford requested and was denied specific accommodations at least three times prior to July 16, 2013.  [*See supra* pp.48-49]  There are at least six subsequent instances where Ford requested, or provided sufficient information for USPS to ascertain, a specific accommodation:

(1)    **Doctor's Note.**  On July 22, 2013, Ford provided USPS with a note from Dr. Woods, indicating that Ford's inability to work was the result of USPS "not accommodating [Ford's] work limitations." [Sum-J.Opp.(JA.B:19).] This led USPS's Health and Resource Management Specialist to direct Ford's supervisors to accommodate his workplace restrictions, but they argued with her instead. [*Id.*Ex.11(JA.C:17).]

(2)    **Direct Statement to Supervisor.**  On July 24, 2013, Ford asked his supervisor if she had received instructions about his workplace limitations and

---

physical limitations—responding that his doctor's orders were "just suggestions" that USPS could disregard (Sum-J.Opp.(JA.B:19-20); Ford.Aff.(JA.A:177))—until July *2014*, more than a year after his request and only after firing him[Ex.25(JA.C:132).]  USPS never offered an accommodation for Ford's psychological disability.

whether those instructions had been approved. [Ford Aff.Ex.D(JA.A:177-178).] She responded that she viewed the instructions as "just suggestions," meaning that she still did not intend to comply with them, and proceeded to bully him. [*Id.*] When Ford told Clark that her treatment of him was stressing him out. [*Id.*] She responded, "If you're so stressed out, why don't you just leave . . . ?" and told him to go see a doctor. [*Id.*] She clearly understood that it was her conduct that was causing Ford's anxiety.

(3) **Doctor's Note.** On August 7, 2013, Dr. Morse provided a note to USPS stating that the "main issue [affecting Ford's ability to work] is continual harassment from supervisors." [Ex.13(JA.C:26-27).]

(4) **First Attorney Request**: On August 28, 2014, Ford's attorney provided USPS with a formal written request that it accommodate "both [his] physical and psychological disabilities." [Ex.22(JA.C:96-99).]

(5) **Sick Leave Request**: In September 2013, Ford requested advance sick leave. Clark denied that request and, instead, disciplined Ford. [Sum.J.Opp.(JA.B.22).]

(6) **Dr. Morse's Note:** USPS received and relied on Dr. Morse's 11-3-14 report in making a modified job offer on November 3, 2014 (more than 16 months after Ford requested an accommodation, after many attempts to discipline him for his medical condition, and still without any accommodation for his psychological disability). [Sum-J.Opp.(JA.B:26).] Dr. Morse states, "In my opinion, there has been a concerted effort on the part of [Ford's] Post Office supervisors to brow-beat, bully and harass Mr. Ford to get him to leave his employment or to make a mistake whereby they can fire him." [Ex.24(JA.C:119).] Dr. Morse details how the supervisors' "blatant[] disregard[]" of Ford's medical restrictions and their threats of firing has placed "tremendous stressors on him including coercion to return back to work when doing so would most likely result in his immediate termination." [*Id.*] Dr. Morse concludes, "the toxic work environment that lead [sic] to him re-injuring his neck and shoulder has now contributed to worsening his underlying depression and anxiety." [*Id.*] From that report, USPS was on notice that Ford's disability could be accommodated by requiring his supervisors to respect Ford's medical restrictions instead of disregarding them.

(6) **Attorney's Second Request.** In a letter dated February 13, 2015, Ford's attorney notified USPS that the modified job offer did not accommodate

Ford's anxiety condition because it does not specify that his local management will strictly adhere to Ford's medical restrictions. [Sum-J.Opp.(JA.B:26); Ex.25(JA.C:136).]  USPS responded stating, "no additional terms will be addressed." [*Id.*]  Again, USPS was on notice that Ford's disability could be accommodated by requiring his supervisors to strictly adhere to Ford's medical restrictions and it refused to provide that accommodation.

These requests by Ford also constituted a request for a particular accommodation that was denied.  Each of the foregoing requests is yet another example of USPS failing to accommodate Ford.  None of these examples was considered by the court.

In sum, when viewed by the correct standard (or even the standard adopted below), there is evidence to show that USPS was aware of the requested accommodation and had the ability—indeed legal responsibility—to provide it, but refused to do so.

### D. Ford Requested Accommodation was Not Limitless.

Finally, Ford presented evidence that the accommodation(s) he requested were reasonable.  The factfinder should have had the opportunity to weigh that evidence.  To pursue a failure-to-accommodate claim, Ford must show that there was a plausibly reasonable accommodation.  *Punt*, 862 F.3d at 1051.  The court again focused only on one of Ford's numerous requests—the July 16 Request—to determine that Ford's requested accommodation was "limitless".  [JA.D:213.] It was not.

The fact that this request—to load his truck with the u-cart over two trips—had

been granted for years, was allowed by other carriers, and was accepted by the HR specialist shows that it was reasonable. [*See supra* n.1; Ford.Depo.I(JA.B:99); Ex.11(JA.C:17).] Furthermore, the other requests detailed above for advanced sick leave, ability to change schedules, and extended FMLA were similarly reasonable. The most fundamental of Ford's request was that his supervisors stop retaliating against him. This was not only reasonable, but legally required. Accordingly, Ford presented significant evidence to show that he requested plausibly reasonable accommodations.

## CONCLUSION

In summary, Ford has established a prima facie case sufficient to overcome summary judgment on his FMLA and Rehab Act claims. Even under the most restrictive ruling, there are disputed issues of fact as to whether USPS's adverse employment action was motivated by discriminatory animus. There are also disputed issues of fact as to whether Ford was an otherwise qualified individual and whether he properly requested a plausibly reasonable accommodation. Ford requests that the ruling discussed herein be reversed and remanded for further proceedings with instructions about the correct legal standards for reviewing disability discrimination claims.

## STATEMENT OF COUNSEL AS TO ORAL ARGUMENT

Appellant respectfully request oral argument to more fully assist the Court with the points of law, fact, and procedural history at issue in this matter, and to permit counsel to address matters of specific concern to the panel.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains no more than 12,821 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman font.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

## CERTIFICATE OF DIGIAL SUBMISSION AND PRIVACY REDACTIONS

I certify that with respect to the foregoing: (1) all required privacy redactions have been made pursuant to Tenth Circuit Rule 25.5; (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program (MSdefender), and according to the program are free of viruses.

Executed this 16th day of March, 2022.

TOMCHAK SKOLOUT, PC

<u>/s/Jenifer L. Tomchak</u>
Jenifer L. Tomchak
Nicole A. Skolout
*Attorney for Appellant*

## CERTIFICATE OF SERVICE

I certify that on the 16th day of March, 2022, I electronically filed the

foregoing **APPELLANT'S OPENING BRIEF** with the Clerk of Court using the

CM/ECF system, which electronically served the following:


Amanda A. Berndt
US Attorney's Office
111 S Main St Ste 1800
Salt Lake City, UT 84111-2176
amanda.berndt@usdoj.gov

*/s/ Abigail Leatherbury*